UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRANCH BANKING AND TRUST
COMPANY,

    Plaintiff,

vs.                                                                  Case No.: 8:12-CV-679-T-17EAJ

OLDSMAR GALLERIA, LLC, et al.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Before the court are Plaintiff Branch Banking and Trust Co.'s (BB&T's) **Motion for Appointment of Receiver to Maintain and Safeguard Assets** (Dkt. 9), Defendants' **Response and Memorandum of Law [sic] Opposition to Plaintiff's Motion for the Appointment of Receiver** (Dkt. 15), and BB&T's **Supplemental Motion to Appoint Receiver and Memorandum of Law** (Dkt. 20).[1] Having conducted a hearing on the motion, it is recommended that the motion for a receiver be granted in part for the reasons set forth below.

**Background**

BB&T is successor in interest to Colonial Bank, which entered into loan agreements with Defendants Oldsmar Galleria, LLC; Oldsmar Galleria Office II, LLC; Lakeland Park Professional Center, LLC; Dade City Professional Center, LLC; JES Properties, Inc.; Douglas J. Weiland; and Elizabeth C. Sirna (collectively "Defendants"). BB&T also names Oldsmar Galleria Condominium Association, Inc. and Unknown Tenants as defendants. BB&T originally filed this action in state

_____

[1] The motion was referred to the undersigned for a report and recommendation.

court on September 28, 2011, and the case was removed to federal court on March 29, 2012. In its Verified Complaint (Dkt. 2), BB&T alleges that Defendants are in default on four loan agreements and seeks, *inter alia*, to enforce guaranties against Douglas J. Weiland ("Weiland") and Elizabeth C. Sirna and to foreclose on mortgaged property that includes the Oldsmar Galleria condominium complex in Pinellas County ("Oldsmar Property"). (Id. ¶ 42) Defendants' motion to dismiss is pending.

At the June 28, 2012 evidentiary hearing on the motion to appoint a receiver, BB&T called Philip Stock, senior analyst and certified appraiser with Integra Realty Resources, Sue Williams, BB&T vice president, and Andrew J. Bolnick, proposed receiver, as witnesses. Defendants called Weiland as a witness.

## **Findings of Fact**

1. BB&T is a North Carolina banking institution and successor in interest to Colonial Bank by asset acquisition from the FDIC as Receiver for Colonial Bank.

2. Oldsmar Galleria, LLC, Oldsmar Galleria Office II, LLC, Lakeland Park Professional Center, LLC, and Dade City Professional Center, LLC, are Florida limited liability companies.

3. JES Properties, Inc., is a Florida corporation, and Oldsmar Galleria Condominium Association, Inc., is a Florida non-profit corporation.

4. Individual defendants Weiland and Elizabeth C. Sirna are Florida residents.

5. BB&T and Defendants are parties to a lending relationship evidenced by a series of loan, security, and perfection documents, resulting in four obligations ("Obligations") due to BB&T.

6. The Obligations are in default.

7. As of September 23, 2011, the Obligations totaled $7,628,764.73, including principal, accrued interest, and late charges. Since the filing of the Verified Complaint, the bank has not received any loan payments.

8. The loan agreements include clauses providing that, in the event BB&T files a lawsuit, BB&T would seek the appointment of a receiver with broad powers.[2] The receiver clauses also state that the appointment of a receiver is an "absolute right" of BB&T, which does not have to show that the value of the property is inadequate or that the lender is insolvent.

9. The Oldsmar Property is a mixed-used, commercial and residential property located at 300 State Street East, Oldsmar, Florida, 34677.

10. The Oldsmar Property and rents generated from the Oldsmar Property are among the collateral securing the Obligations.

11. The Oldsmar Property is comprised of 1.34 acres improved with one building, a three- and four-story condominium complex of approximately 60,000 square feet that was completed

---

[2] One such provision in the Mortgage and Security Agreement dated October 7, 2004 reads:
> 11. Receiver. In addition to the right given in the preceding paragraph, in the event that at the beginning or at any time pending any suit upon this Mortgage, or to foreclose it, or to reform it and/or to enforce payment of any claims hereunder, Bank shall apply to the court having jurisdiction thereof, for the appointment of a Receiver, such court shall forthwith appoint a Receiver of the Property, including all and singular the income, profits, issues and revenues from whatever source derived, each and every of which it being expressly understood, is hereby mortgaged as if specifically set forth and described in the granting clauses hereof, and such Receiver shall have all the broad and effective functions and powers in anywise entrusted by a court to a Receiver, and such appointment shall be made by such court as to admitted equity and a matter of absolute right to Bank, and without reference to the adequacy or inadequacy of the value of the Property or to the solvency or insolvency of the Mortgagor. Such rents, profits, incomes, issues and revenues shall be applied by the Receiver according to the lien and/or equity of Bank and the practice of such court and such appointment of Receiver shall be without notice to any obligor hereunder.

(Dkt. 20 at 3)

in 2007. The Oldsmar Property includes approximately 13,916 square feet of retail space; twenty (20) residential units; two (2) office units owned by Oldsmar Galleria Office, LLC; and additional commercial units for leasing.

12. Of the 13,916 square feet of retail space, approximately 3,760 square feet has been completed and more than 10,000 square feet of retail space remains unfinished, with dirt floors, concrete walls, and exposed ceilings.

13. Of the twenty residential condominium units, seven are owned by Oldsmar Galleria, LLC.

14. The Oldsmar Property's appraised value is $2,050,000 in its current condition and $2,360,000 if the unfinished retail space on the ground floor were completed, according to certified appraiser Philip Stock ("Stock") from Integra Realty Sources, who evaluated the Oldsmar Property for BB&T.[3]

15. Tampa Bay Realty is a management company that was hired by the Oldsmar Galleria Condominium Home Owner's Association ("HOA") to manage the Oldsmar Property building.

16. Weiland is the president of the HOA, which has two additional board members. One of the other board members is an employee of JES Properties, Inc., which is a company run by Weiland.

---

[3] Weiland disputed BB&T's appraisal and testified that the Oldsmar Property cost approximately $8 million to develop - $400,000 for the land and more than $7 million in construction costs. He estimated the property's present value at a minimum of $6 million, but did not provide documentation to support his estimate. Stock's testimony is more credible. In preparing his appraisal, Stock used the income capitalization approach that bases a property's value on its income-generating potential. This methodology is typically applied to mixed-use properties. Weiland indicated that the cost approach, in which the value is based on the cost of constructing a replacement building, was more appropriate. However, Stock explained that he did not use the cost approach because buildings are selling for less than their replacement values in the current market.

17. JES Properties, Inc., oversees the leased retail, commercial, and residential units in the Oldsmar Property.

18. BB&T paid the 2009, 2010, and 2011 Pinellas County real estate taxes on the Oldsmar Property, which were $56,026.70, $38,913.98, and $36,518.18, respectively.

19. After requesting and not receiving confirmation that the Oldsmar Property was adequately insured, BB&T purchased insurance for the Oldsmar Property in May 2012.

20. In early 2012, BB&T sent a rent demand to the tenants of the Oldsmar Property.

21. Thereafter, the HOA, with Weiland serving as its president, sent a rent demand to the tenants of the Oldsmar Property, effectively countermanding BB&T's rent demand.

22. BB&T has not received any rents from the Oldsmar Property.

23. The HOA is collecting rents from the Oldsmar Property.

24. Andrew J. Bolnick ("Bolnick") is a professional receiver and trustee proposed by BB&T to serve as receiver for the Oldsmar Property. (Dkt. 25)

25. Bolnick estimated his fees as receiver would be a flat fee of $3,500 per month.

## Conclusions of Law

In the Eleventh Circuit, the appointment of a receiver in a diversity action is governed by federal law. Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp., 153 F.3d 1289, 1292 (11th Cir. 1998). The decision whether to appoint a receiver "rests in the sound judicial discretion" of the court. Atlantic Trust Co. v. Chapman, 208 U.S. 360, 377 (1908). Nevertheless, appointment of a receiver is an extraordinary equitable remedy available when there is no remedy at law or the remedy

is inadequate. U.S. v. Bradley, 644 F.3d 1213, 1310 (11th Cir. 2011).[4]

In this case, the parties' lending relationship is documented in mortgage agreements, amendments, modifications, guaranties, cross default/cross collateralization agreements, and renewals executed from August 2004 through August 2009. At least four of the documents include express Receiver clauses dictating that, at any time during the pendency of a lawsuit, BB&T can seek without notice the appointment of a receiver with broad powers, including the collection of rents and other revenue from the Oldsmar Property. Moreover, the provisions state that the appointment of a receiver does not depend on the adequacy or inadequacy of the property, nor the solvency or insolvency of Defendants.

Pointing to Defendants' acceptance of these terms on multiple occasions, BB&T argues that appointment of a receiver is automatic. In response, Defendants do not dispute that the Receiver clauses were triggered by the filing of the lawsuit, but assert that the Court must consider other factors, including the potential for waste and fraud which are not present in this case.

The Court concludes that, at a minimum, the Receiver clauses are entitled to great weight.[5]

---

[4] In deciding if a receiver is warranted, the borrower's solvency and whether the property's value is adequate to cover the outstanding debt are relevant factors. See Omaha Hotel Co. v. Kountze, 107 U.S. 378, 395 (1883). Other relevant factors are: (1) fraudulent conduct on the part of the defendant; (2) imminent danger that the property will be lost or squandered; (3) inadequacy of legal remedies; (4) probability that harm to plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (5) plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; (6) whether plaintiff's interests sought to be protected will in fact be well-served by a receivership. See Nat'l P'ship, 153 F.3d at 1291 (citing Consol. Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 326-27 (1st Cir. 1988)).

[5] See generally U.S. v. Chester Park Apartments, 332 F.2d 1, 5 (8th Cir. 1964) (acknowledging that an express receiver clause carries weight in determining whether a receiver should be appointed but also considering other factors); U.S. v. Queen's Court Apartments, 296 F.2d 534, 540 (9th Cir. 1961) (holding that a receiver was warranted "in accordance with the terms of the mortgage during the pendency of the foreclosure action"); Garden Homes v. U.S., 207 F.2d 459,

The Receiver clauses in the loan agreements are sweeping, stating that an appointed receiver will have broad powers to collect rents, profits, incomes, issues, and revenues from the mortgaged property, as well as any additional powers granted by a court. There is nothing cryptic about these provisions. They clearly put Defendants on notice of such a consequence in the event of a default. After signing multiple agreements including the Receiver clauses, Defendants cannot protest that BB&T's request for a receiver is unexpected or unsupportable.

Even if the Receiver clauses are not dispositive,[6] there are sufficient indicia warranting the appointment of a receiver. BB&T paid the Pinellas County real estate taxes on the Oldsmar Property for 2009, 2010, and 2011, and recently purchased insurance for the property after Defendants failed to provide documentation that the property was insured. Moreover, the value of the property - estimated at a maximum of $2.36 million - is plainly insufficient to secure the nearly $7.63 million indebtedness as of September 2011.

After Defendants stopped making mortgage payments in the spring of 2011, BB&T sent a rent demand to tenants of the Oldsmar Property in early 2012. However, an attorney for the HOA,

---

459-60 (1st Cir. 1953) (per curiam) (explaining that the "express terms of the mortgage" empowered the court to "appoint without notice a receiver").

[6] It does not appear that the Eleventh Circuit has addressed the impact of a contractual receiver clause on the traditional analysis for appointment of a receiver. District court opinions are not uniform. Compare Cadence Bank v. Manausa Holdings, LLC, No. 4:12cv38-WS/WCS, 2012 WL 1252494, at *4 (N.D. Fla. Mar. 30, 2012) (stating that appointment of a receiver was justified, *inter alia*, because defendants had agreed to a receiver if they defaulted), and Fed. Nat'l Mortg. Ass'n v. Maple Creek Gardens, LLC, No. 09-14703, 2010 WL 374033, at *2-3 (E.D. Mich. Jan. 25, 2010) (declaring that an express provision was sufficient to warrant appointment of receiver, yet also considering additional factors); with Sterling Sav. Bank v. Citadel Dev. Co., 656 F. Supp. 2d 1248, 1260-61 (D. Or. 2009) (explaining that a defendant's contractual consent to a receiver does not relieve the court from evaluating factors), and D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc., 550 F. Supp. 2d 481, 491 (S.D. N.Y. 2008) (noting that the mere existence of contractual provision does not dispose of the court's inquiry into the appropriateness of a receiver).

7

with Weiland as HOA president, subsequently notified tenants that rent should be paid to the HOA, thereby impeding BB&T's efforts to collect the money.

BB&T has established danger of waste and risk of loss to the property through inadequacy of the collateral to secure the mortgages, and potential unpaid taxes and lack of insurance. Although Defendants contend that the value of the Oldsmar Property's cross-collateralized properties is sufficient to cover the outstanding debt, Defendants do not provide any evidence establishing the aggregate value of the collateral. Any prejudice to Defendants if the receiver is appointed is outweighed by the potential harm to the bank if a receiver is not appointed. It is likely that the bank will prevail in its foreclosure action. Accordingly, BB&T has sufficiently met its burden of showing that other factors, in addition to the express contractual provisions, justify the appointment of a receiver.

The remaining issue is what powers the receiver should have. While disputing the need for a receiver, at the hearing Defendants offered to turn over to BB&T all monies generated by the Oldsmar Property after the payment of expenses, if a receiver is appointed. Plaintiffs argue that the express language of the Receiver clauses allows the appointment of a receiver to both manage the Oldsmar Property, including paying expenses, and to collect rents and other revenues produced by the property.

In this case, the Court recommends that the receiver be permitted to both manage the property, pay expenses, and to collect rents, profits, incomes, issues and revenues. However, any major improvements to the property suggested by the receiver should be subject to Court approval

on a case-by-case basis.[7] Lastly, as the proposed receiver has substantial experience, and there is no indication that he has ever been derelict in his duties, it is recommended that no bond be required.

## Conclusion

Accordingly, and upon consideration, it is **RECOMMENDED** that Plaintiff's **Motion for Appointment of Receiver to Maintain and Safeguard Assets** (Dkt. 9) and Plaintiff's **Supplemental Motion to Appoint Receiver and Memorandum of Law** (Dkt. 20) be **GRANTED IN PART** as set forth above.

**Date: July 20, 2012**

ELIZABETH A JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

**Any party objecting to the factual findings in this report and recommendation shall file with the objections a copy of the hearing transcript and provide specific citations to relevant portions of the transcript.**

---

[7] For example, although the Oldsmar Property was completed in 2007, more than 10,000 square feet of potential retail space remains unfinished on the ground floor. Although the additional space represents a resource that could add value to the Oldsmar Property, any renovation decision could adversely impact Defendants by adding to the litigation costs. Also, it is unclear what rental market there is for such additional space.

Copies to:
District Judge
Counsel/Parties of record